UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LI ZHUO LIN, | : | |
| Plaintiff, | : | CIVIL ACTION - LAW |
| - against - | : | **JURY TRIAL DEMANDED** |
| WILLIAM SKOTLESKI, BRIAN KONOPKA, ANTHONY DOBLOVASKY, and JUSTIN HOPE. | : | No. |
| Defendants. | : | |

## COMPLAINT

Plaintiff, Li Zhuo Lin, by his attorneys, Matthew L. Clemente, Esq. and Benjamin N. Stanton, Esq., for his Complaint, alleges as follows:

## INTRODUCTION

The Pennsylvania State Police ("PSP")operates a quasi-constitutional crew of highway interdiction officers called the "SHIELD Unit."[1] The SHIELD crew are trained to conduct pretextual traffic stops

[1] SHIELD stands for "Safe Highways Initiative through Effective Law Enforcement and Detection."

in hopes of seizing drugs and other contraband. The SHIELD crew targets, disproportionally stops, and disproportionally searches minority motorists. One of their tactics is to prolong traffic stops in hopes of developing reasonable suspicion.

It is axiomatic that the Fourth Amendment requires more than "inarticulate hunches" to justify investigative stops. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). Instead, traffic stops require reasonable suspicion. *United States v. Delfin-Colina*, 464 F.3d 392, 396-97 (3d Cir. 2006). Likewise, reasonable suspicion is required to *extend* traffic stops. *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015).

***

This is a case about artifice. It is about an officer trained to take hunches and create the illusion of reasonable suspicion. It is about an officer trained to blur the lines between experience and premonition: good police work and unconstitutional searches and seizures.

In this case, SHIELD trooper Defendant Brian Konopka ("Konopka") crossed that line. He illegally extended a traffic stop of a vehicle where there was an Asian driver and Asian passenger, Plaintiff

Li Zhuo Lin ("Mr. Lin"). After ostensibly stopping the vehicle for traffic violations, Konopka immediately pivoted to his real mission - seeking drugs and other contraband despite an absence of reasonable suspicion.

Konopka searched the vehicle and found no contraband. However, after seizing Mr. Lin and the vehicle, Konopka discovered $150,200.00 in United States currency belonging to Mr. Lin. Despite no evidence that the currency seized was connected with any illegal conduct, and with no due process, Konopka seized the money. Nearly a year and a half later, Defendant William Skotleski ("Skotleski") proceeded as the affiant in a state court forfeiture action, conspiring with Konopka and the other defendants to steal Mr. Lin's money.

JURISDICTION AND VENUE

1. This action arises out of violations of 42 U.S.C. § 1981, 42 U.S.C. § 1983 and the common law.

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1343. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because all defendants reside in this State and some of the defendants reside in this judicial district, and because a

substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

3. Plaintiff is a citizen of New York. Upon information and belief, defendants are citizens of Pennsylvania. The amount in controversy exceeds $75,000.

## THE PARTIES

4. Plaintiff Li Zhuo Lin is, currently and at all relevant times was, a resident of New York.

5. Defendants Konopka, Skotleski, Anthony Doblovasky ("Doblovasky") and Justin Hope ("Hope") are troopers employed by PSP.

6. Upon information and belief, defendants are residents of the Commonwealth of Pennsylvania.

## BACKGROUND

### Defendant Konopka Initiates Pretextual Traffic Stop

7. On or about July 16, 2022, Mr. Lin was the passenger of a 2022 BMW X5 ("BMW").

8. The BMW was driven by Kai Chen ("Chen").

9. The BMW was registered to Chen's significant other, Junyi Zhong.

10. Konopka alleges that he observed Chen “adjust his posture in his seat” as the BMW passed his position and that this for some reason prompted Konopka to follow the BMW.

11. Konopka proceeded to stop the BMW after it allegedly went over the fog line momentarily and failed to come to a complete stop at an intersection.

Defendant Konopka Illegally Extends the Traffic Stop

12. Upon initial interaction with Mr. Lin and Chen, Defendant Konopka advised them of the purported reasons for the traffic stop.

13. During this initial interaction, Konopka also obtained Chen’s driver’s license, vehicle registration and car insurance information.

14. Although positioned safely in a parking lot away from the roadway with other traveling motorists, Konopka requests that Chen step out of the BMW and come back to his police cruiser rather than conducting the traffic stop at the BMW’s driver-side window.

15. Upon interaction with Chen at his cruiser, Konopka quickly realized that he was unable to effectively communicate with Chen due to a language barrier as Chen spoke Mandarin.

16. As a result, Konopka sought to utilize an unofficial translation application from his personal cell phone in an effort to have an effective conversation with Chen.

17. Utilizing this unofficial translation application, Konopka proceeds to ask Chen a litany of questions wholly unrelated to the traffic violations Chen is alleged to have committed.

18. In fact, following the explanation for the stop during the initial contact, Konopka never again discusses or mentions the alleged traffic violations, nor does he issue either a citation or a warning to Chen for said alleged violations.

19. In other words, Konopka immediately detoured from the ostensible mission of the stop, purported traffic violations.

20. Instead, Konopka questioned Mr. Lin and Chen about their travel itinerary and their personal lives.

21. When Konopka went off mission from the traffic violations, Konopka lacked reasonable suspicion to investigate any other offense.

22. Following approximately nine (9) minutes of questioning of Chen, Konopka then proceeds to question Mr. Lin.

23. Konopka similarly questions Mr. Lin about matters wholly unrelated to the alleged traffic violations, and again, focuses his questions on Mr. Lin's travel plans and whereabouts.

24. After approximately four (4) minutes of questioning Mr. Lin, Konopka returns to Chen.

25. Once again utilizing this unofficial translation application, Konopka proceeds to question Chen as to whether there is any illegal contraband in his vehicle.

26. All the while, Mr. Lin and Chen, who do not speak English, struggled to understand what Konopka was even saying.

27. Google translate is no substitute for a human translator.

28. Despite having access to a Mandarin-speaking member of PSP, Konopka chose not to contact a human translator at this time.

29. Konopka did not care about what Mr. Lin and Chen could understand him.

30. Instead, he was attempting to justify illegally searching the vehicle based on their answers to his questions regardless of whether Mr. Lin and Chen understood the questions.

31. Although Chen denied any such contraband and despite no evidence of any illegal activity, Konopka then requested consent to search the vehicle.

32. Chen subsequently provides consent to search.

33. As the search began, Chen clarified the scope of the consent provided, advising Konopka that he was granting permission to search the passenger compartment of the vehicle, but not the trunk or hatch area, where Mr. Lin's property was located.

34. At this point, Konopka continued to detain Mr. Lin and Chen on scene, despite an absence of probable cause or reasonable suspicion of any crime, so that he could request a PSP K-9 Unit to the scene.

35. While waiting for a K-9, Defendant, and SHIELD Trooper, Hope arrived on scene to assist.

36. Konopka advised Hope of what transpired.

37. After over an hour from the time of the initial stop, Defendant Doblovasky finally arrived on scene with a K-9 Unit.

38. Following the K-9 “sniff” of the vehicle, it is alleged that the K-9 “alerted” to the vehicle.

39. It was not until this point that Konopka contacted a Mandarin-speaking member of PSP, Mao Ye ("Ye").

40. Through Ye, Konopka again attempted to get Mr. Lin and Chen to consent to search the vehicle.

41. Given that there was nothing illegal in the vehicle, they again refused.

42. At this point, Konopka, Hope, and Doblovasky called for a tow truck to come take the BMW.

43. Kisenwether Towing responded to the dispatch and towed the vehicle to PSP Hazleton’s Impound Lot.

44. Mr. Lin and Chen were arrested and brought to PSP Hazleton.

45. They were detained at the barracks for a prolonged period and only released after agreeing to sign papers which were in English and which they could not understand.

46. The search of the vehicle recovered a large sum of cash, however no drugs or other contraband was located.

47. Mr. Lin had broken no criminal laws and had done nothing wrong.

48. Neither Mr. Lin nor Chen was cited or received any paperwork in the mail alleging any criminal or traffic offenses.

49. Instead, nearly a year and a half later, Defendant Skotleski proceeded as the affiant in a state court forfeiture action, conspiring with Konopka and Hope to steal Mr. Lin's money.

50. There was no evidence that the currency seized was involved in any criminal offense.

51. The only alleged basis for Skotleski filing the forfeiture petition or for PSP keeping Mr. Lin's money was that an ION scan revealed that some of the seized currency, like most currency in circulation, had trace exposure to cocaine.

52. No defendant intervened to prevent or limit the other defendants' violations of Mr. Lin's Constitutional rights or to prevent or limit any of the incidents described above.

Damages

53. As a result of defendants' violation of Mr. Lin's Constitutional rights, Mr. Lin suffered substantial injuries and damage.

## COUNT ONE
(42 U.S.C. § 1983)

54. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 53 as if fully repeated herein.

55. The defendants stopped, detained, and seized Mr. Lin without probable cause or reasonable suspicion, in violation of Mr. Lin's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

56. The defendants searched Mr. Lin's belongings without probable cause or reasonable suspicion, in violation of Mr. Lin's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

57. The defendants' stop, detention, search and seizure of Mr. Lin and his property as set forth above constituted purposeful discrimination because of his Asian origin. Upon information and belief, defendants do not stop, search and seize Caucasian people and their property without probable cause or reasonable suspicion. Defendants' actions therefore violated Mr. Lin's equal protection rights under the Fourteenth Amendment to the United States Constitution.

58. Mr. Lin had a property interest in the property seized and taken by the defendants. The defendants failed to afford Mr. Lin just compensation or due process of law prior to or following the seizure of his property. Defendants' actions therefore violated Mr. Lin's due process rights under the Fourteenth Amendment and the takings clause of the Fifth Amendment to the United States Constitution.

59. The defendants conspired with each other to violate Mr. Lin's Constitutional rights as described above.

60. The defendants' conduct therefore was a deprivation, under color of state law, of rights guaranteed to Mr. Lin under the Fourth and Fourteenth Amendments to the United States Constitution.

61. As a result of defendants' violations of Mr. Lin's Constitutional rights, Mr. Lin's suffered substantial injuries and damage.

**COUNT TWO**
(42 U.S.C. § 1981)

62. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 61 as if fully repeated herein.

63. Mr. Lin is a member of a racial minority. Defendants discriminated against him based on his race. Defendants thus denied Mr. Lin the full and equal benefit of the laws and proceedings for the security of persons and property as is enjoyed by white citizens.

64. As a result of defendants' denial to Mr. Lin of the full and equal benefit of the law, Mr. Lin suffered substantial injuries and damage.

**COUNT THREE**
(Conversion)

65. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 64 as if fully repeated herein.

66. Mr. Lin owned and possessed the property seized by

defendants, including $150,200.00 in cash.

67. Defendants conspired to deprive Mr. Lin of his property.

68. Mr. Lin did not consent to defendants' seizing his property.

69. Defendant seized Mr. Lin's property without lawful justification.

70. As a result of defendants' the seizure, Mr. Lin's suffered substantial injuries and damage.

WHEREFORE, the plaintiff demands judgment as follows:

A. For Counts One and Two, an amount to be determined at trial, including punitive damages and interest;

B. For Count Three, an amount to be determined at trial, including interest;

C. For the plaintiff's attorneys' fees, pursuant to 42 U.S.C. §1988;

D. For the costs and disbursements incurred in this action; and

E. For such other and further relief as the Court deems just and proper.

MATTHEW L. CLEMENTE, ESQ.
/s/ Matthew L. Clemente
PA Bar: 318611
88 North Franklin Street
Second Floor
Wilkes-Barre, PA 18701
(570) 266-8986

BENJAMIN N. STANTON, ESQ.
/s/ Benjamin N. Stanton
PA Bar: 323321
88 North Franklin Street
Second Floor
Wilkes-Barre, PA 18701
(570) 665-4490

*Attorneys for Plaintiff*

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues.